**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RODNEY HARVEY, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 19-cv-2996 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| THOMAS DART, Sheriff of Cook County, | ) | |
| and COOK COUNTY, ILLINOIS, | ) | |
| | ) | |
| Defendants. | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiff Rodney Harvey had decaying teeth that needed pulling while he was detained at Cook County Jail. He was in a great deal of pain, so he sought treatment by submitting a Health Service Request Form. But his request about sore teeth fell on deaf ears. Two weeks passed before he saw a jail dentist.

The jail dentist, however, did not pull the teeth. Cook County Jail has a policy of referring some procedures – including some, but not all, tooth extractions – to off-site oral surgeons at Stroger Hospital. So, after he saw the jail dentist, Harvey was referred to Stroger Hospital. And then, Harvey had to hurry up and wait, at the back of the line.

Meanwhile, Harvey was prescribed pain medications, but his teeth kept hurting. In the end, after experiencing a toothache for 51 days, Harvey finally saw an oral surgeon at Stroger Hospital who removed two teeth.

Harvey later sued Cook County Sheriff Thomas Dart and Cook County for alleged failures in his dental treatment. He claims that the dual delays – waiting to see a jail dentist, and then waiting to see an oral surgeon – caused him significant unnecessary pain.

Dental care delayed is not necessarily dental care denied.  But in the meantime, it hurts.  So Harvey seeks compensation for the unnecessary infliction of pain.  He faults the jail for providing inadequate dental care, claiming that the delays violated his rights under the Fourteenth Amendment.

After discovery, Sheriff Dart and Cook County moved for summary judgment.  For the reasons that follow, the Defendants' motion is granted.

## Background

Plaintiff Rodney Harvey was a pretrial detainee at Cook County Jail.  *See* Am. Cplt., at ¶ 2 (Dckt. No. 44); Pl.'s Resp. to Defs.' Statement of Undisputed Facts ("Pl.'s L.R. 56.1 Resp."), at ¶ 10 (Dckt. No. 128).  Before getting to the toothache at the heart of the case, the Court will recount some history of the dental care policy at Cook County Jail.

## I.     Cook County Policies

Sheriff Thomas Dart is responsible for the operation of Cook County Jail, and Cook County is responsible for detainees' health and well-being.  Cermak Health Services, a division of Cook County, provides medical and dental care for the inmates.  Harvey alleges that two practices at Cook County Jail regularly result in extended and unreasonable delays in treatment.

The first practice is about the scheduling of inmate dental appointments.  When an inmate needs dental care or non-emergency medical assistance, he can submit a Health Service Request Form ("HSRF").  *See* Pl.'s L.R. 56.1 Resp., at ¶¶ 14, 45 (Dckt. No. 128).  The HSRF asks inmates to indicate a level for any dental pain that they're experiencing, ranging from 1 (low) to 10 (high).  *See* Pl.'s HSRF (Dckt. No. 129-16).  Someone at the County (although it is disputed who) then collects the inmate's HSRF to assess an inmate's medical needs and takes appropriate

2

action – usually in the form of scheduling an appointment. *See* Pl.'s L.R. 56.1 Resp., at ¶ 18 (Dckt. No. 128).

After the County collects an inmate's HSRF, dental assistants handle the scheduling of dental appointments. In other words, the jail delegates to dental assistants the task of scheduling the appointments. *Id.* So, when an inmate needs to see a dentist, he submits an HSRF, someone at the jail collects it, and then a dental assistant schedules the appointment on a timetable that is consistent with the jail's system. *Id.*

Cook County Jail puts the requests into categories and prioritizes inmates with the greatest need. Inmates with "routine" requests should receive an appointment within 30 days. *Id.* at ¶ 16. Inmates with "priority" requests require an appointment within 14 days. *Id.* And inmates with "urgent" requests need to be seen within 72 hours. *Id.* at ¶ 15. The greater the need, the faster the care – in theory, anyway.

Toothaches are urgent. An "urgent" condition is one where the patient complains of pain greater than a five on his HSRF, or complains of a toothache, or complains of swelling. *Id.* at ¶ 17. Thus, many inmates seeking dental care for painful teeth require an urgent appointment scheduled by a jail dental assistant, and under the jail's policy, they should be seen within 72 hours.

The second practice is about the procedures for tooth extractions. Before March 2007, Cook County Jail had an on-site oral surgeon and six on-site dentists. *See* Defs.' Resp. to Pl.'s Statement of Undisputed Facts ("Defs.' L.R. 56.1 Resp."), at ¶ 8 (Dckt. No. 131). During that period, an oral surgeon evaluated inmates with urgent dental needs within seven days. *Id.*

For whatever reason (the evidence suggests the culprit was budget cuts), a reduction in staff apparently left the jail with no on-site oral surgeon. So the County enlisted a third-party

provider for oral surgery needs, including certain tooth extractions that a jail dentist could not complete on-site. *Id.* at ¶ 10.

Basically, the County outsourced oral surgery, by replacing its on-site oral surgeon with an off-site oral surgeon. It began referring inmates who needed oral surgery to the Oral and Maxillofacial Surgery outpatient clinic at the John H. Stroger, Jr. Hospital ("Stroger"). *Id.*

That change did not mean that no teeth were pulled at the jail. After the change, the jail continued to employ on-site dentists, and sometimes the on-site dentists could extract teeth. *Id.* at ¶ 26; *see also* Fegan Dep., at 95:3-23 (Dckt. No. 128-2). But not always. An on-site extraction at the jail isn't always possible.

Some tooth extractions take place at the jail (by a jail dentist), and some tooth extractions take place at Stroger Hospital (by an oral surgeon). It depends on the inmate's needs. If the required extraction falls outside the skillset or training of the jail dentist, or if the detainee would be better served by a specialist in a hospital, the jail dentist can refer the patient to Stroger for extraction by an oral surgeon. *See* Defs.' L.R. 56.1 Resp., at ¶ 27 (Dckt. No. 131); Alexander Decl., at ¶ 9 (Dckt. No. 122-7).

The parties disagree about how an outside referral to Stroger Hospital can take place. Plaintiff contends that only one method of referral exists. As Plaintiff tells it, the jail dentist enters a routine electronic referral in the electronic medical records system used by Cook County Health, and a Stroger clerk schedules an oral surgery appointment. *See* Pl.'s L.R. 56.1 Resp., at ¶ 28 (Dckt. No. 128); Alexander Decl., at ¶ 10 (Dckt. No. 122-7); Defs.' L.R. 56.1 Resp., at ¶ 14 (Dckt. No. 131); 2/24/2021 Taylor Dep., at 58:17-21 (Dckt. No. 122-15) (Q: "As a dentist working for Cermak, do you have the ability to call over to the Stroger oral surgery department and expedite a person to receive an extraction?" A: "No.").

4

From that point on, according to Plaintiff, it is out of the jail's hands. *See* Defs.' L.R. 56.1 Resp., at ¶ 14 (Dckt. No. 131). The jail dentist has no control over when the inmate will have an extraction at Stroger, and the inmate must wait to be scheduled by a Stroger clerk. *Id.* That is, the jail can book an appointment at Stroger, but cannot dictate when the inmate will receive care at Stroger.

Sheriff Dart and the County argue that there are other ways into Stroger in addition to electronic referral. According to Defendants, if the detainee's needs are urgent, the dentist can circumvent the electronic referral by personally escalating a referral through Cermak's scheduling department at Cook County Jail. *See* Pl.'s L.R. 56.1 Resp., at ¶ 32 (Dckt. No. 128); Alexander Decl., at ¶ 11 (Dckt. No. 122-7). Dentists can escalate referrals by contacting either (1) Laura Hernandez, the Cermak clerk who handles expedited surgery requests; or (2) Dr. Jorelle Alexander, the Chair of the Department of Oral Health for Cook County Health. *See* Alexander Decl., at ¶ 11 (Dckt. No. 122-7).

The parties agree that a patient also can take the emergency route to Stroger Hospital. Detainees with emergent conditions go to the Urgent Care Clinic at the jail, and can end up at the Emergency Department at Stroger where an oral surgeon is always on call. *Id.* at ¶ 12; *see also* Pl.'s Resp., at 6 (Dckt. No. 130) ("Other than send a patient to urgent care to be sent to Stroger Hospital for an emergency or urgent – meaning the patient has a fractured jaw or massive swelling – a electronic referral is the only way to facilitate an oral surgery appointment.").

## II.     Plaintiff's Toothache

Back to the toothache. At some point during Harvey's detention at Cook County Jail, his tooth began to hurt. The record does not reveal when the tooth started hurting. But on December 3, 2018, Harvey requested dental care for his toothache by filling out an HSRF. *See*

Pl.'s L.R. 56.1 Resp., at ¶ 45 (Dckt. No. 128). The staff collected the request the next day, on December 4, 2018. *See* Defs.' L.R. 56.1 Resp., at ¶ 28 (Dckt. No. 131).

Harvey reported significant pain. On his HSRF, he complained of dental pain rated 8 out of 10. *See* Pl.'s HSRF (Dckt. No. 129-16). Under Cook County Jail policy, Harvey's dental needs were urgent. So, he should have been seen within three days after his HSRF was collected, meaning within three days of December 4, 2018.

Even so, the jail's response was unhurried. The jail collected his HSRF on December 4. But he did not receive a dental appointment within three days, or even a week. He waited, but no response came.

He received a response 10 days later. On Friday, December 14, a dental assistant (Antoinette Polk) scheduled him to see a dentist on Tuesday, December 18. *See* Defs.' L.R. 56.1 Resp., at ¶ 29 (Dckt. No. 131); *see also* Scheduling Records, at 1 (Dckt. No. 122-13). Two of the intervening days fell on a weekend (*i.e.*, Saturday, December 15 and Sunday, December 16). Polk scheduled the appointment as "Urgent." *See* Defs.' L.R. 56.1 Resp., at ¶ 29. In the meantime, Harvey saw no one for evaluation. *Id.* at ¶ 28. He continued to wait.

So, from the day of his request (on December 4) to the day of his appointment (on December 18), two weeks passed by. *See* Defs.' L.R. 56.1 Resp., at ¶ 29 (Dckt. No. 131). No one knows why it took so long. *Id.*

When the December 18 appointment came around, Dr. Taylor – the dentist who examined Harvey – determined that "four teeth needed to be extracted." *See* 4/21/2021 Taylor Dep., at 167:7 – 169:14 (Dckt. No. 122-14). Specifically, she identified gross caries – a decay affecting the entire tooth – on teeth numbers 14, 16, 17, and 32. *Id.* at 167:7 – 169:14. She prescribed him amoxicillin (used to treat infections), chlorhexidine oral rinse, and ibuprofen. *See*

6

Pl.'s Medication Profile History, at 1–3 (Dckt. No. 129-19); Pl.'s L.R. 56.1 Resp., at ¶ 52 (Dckt. No. 128).

During the examination, Dr. Taylor also determined that Harvey presented "poor" oral condition. In other words, she noticed very little evidence of daily oral hygiene. *See* 4/21/2021 Taylor Dep., at 112:23 – 113:4 (Dckt. No. 122-14); Pl.'s L.R. 56.1 Resp., at ¶ 47 (Dckt. No. 128). According to her testimony, Harvey's oral condition and symptoms were chronic in nature and pre-existed his detention at the jail. *See* 2/24/2021 Taylor Dep., at 209:9 – 210:10 (Dckt. No. 122-15) ("[I]t's gross caries. A tooth is not going to decay that fast. It's pre-existing.").

For his part, Harvey contends that he brushes his teeth "twice or three times a day." *See* Harvey Dep., at 278:20-21 (Dckt. No. 122-3). He testified that this episode was his first-ever dental care issue and that he never had much of a need to go to the dentist before then. *Id.* at 184:21 – 185:6. In fact, it had been a while. Harvey estimated that he had not seen a dentist in 10 years. *Id.* at 207:4-8.

Although Dr. Taylor determined that four teeth needed extraction, she did not extract any teeth during Harvey's December 18 appointment. *See* 4/21/2021 Taylor Dep., at 170:11-20 (Dckt. No. 122-14). Her clinical note does not reveal why she declined to provide definitive treatment (meaning an extraction). *See* Defs.' L.R. 56.1 Resp., at ¶ 31 (Dckt. No. 131). At deposition, she had no recollection of ever treating Harvey. *Id.*

For whatever reason, instead of extracting the teeth herself, Dr. Taylor referred Harvey to Stroger Hospital for oral surgery. *See* Pl.'s L.R. 56.1 Resp., at ¶¶ 47, 50, 52, 54 (Dckt. No. 128); Scheduling Records, at 9 (Dckt. 122-13). Based on that referral, Plaintiff was originally scheduled for an extraction at Stroger Hospital on March 18, 2019, three months later. *See* Pl.'s

L.R. 56.1 Resp., at ¶ 55. In effect, Harvey got to the front of one line, only to learn that he had to go to the back of a second one.

Dr. Taylor electronically submitted the referral to Stroger Hospital as a routine oral surgery referral. *See* 4/21/2021 Taylor Dep., at 112:10-13 (Dckt. No. 122-14). Dr. Taylor testified that she did so because "there was no present evidence of swelling, no difficulty speaking, no difficulty chewing, no difficulty swallowing, no extreme pain that affected his ability to function." *Id.* at 112:13-17. Even so, Dr. Taylor's clinical note from that visit noted that Harvey "stated he has had pain for 2 weeks," and had indicated a pain level of "10/10." *See* Pl.'s Dental Records, at 1 (Dckt. No. 128-19).

Harvey took his medicine as prescribed. While Harvey waited for his extraction appointment, he was taking between six and eight 800-milligram doses of ibuprofen each day. *See* Defs.' L.R. 56.1 Resp., at ¶ 33 (Dckt. No. 131). But the pain medications weren't helping. He testified that "there [was] no amount of pills that will stop your pain." *Id.*; Harvey Dep., at 313:1-11 (Dckt. No. 122-3).

So, on December 26, 2018, Harvey wrote a grievance indicating that the pain medication was "not working" and that he was in "constant pain daily." *See* Defs.' L.R. 56.1 Resp., at ¶ 34 (Dckt. No. 131); Harvey Grievance, at 1 (Dckt. No. 128-4). He appealed this grievance on January 15, 2019, and reiterated his constant pain. *See* Defs.' L.R. 56.1 Resp., at ¶ 34 (Dckt. No. 131); Harvey Grievance, at 2 (Dckt. No. 128-4).

On January 14, 2019, Harvey went to see Dr. Taylor again. *See* Pl.'s L.R. 56.1 Resp., at ¶ 56 (Dckt. No. 128); 4/21/2021 Taylor Dep., at 114:6-10 (Dckt. No. 122-14). This time, the appointment was scheduled by Dr. Alexander, not a dental assistant. *See* Pl.'s L.R. 56.1 Resp., at ¶ 57 (Dckt. No. 128). At this second visit, Dr. Taylor prescribed another round of amoxicillin

and ibuprofen. *See* Defs.' L.R. 56.1 Resp., at ¶ 32 (Dckt. No. 131). She once more determined that Harvey was "not making any effort to keep his mouth clean." *See* 4/21/2021 Taylor Dep., at 114:16-17 (Dckt. No. 122-14). And she found more gross caries on other teeth. *See* Pl.'s Dental Records, at 3 (Dckt. No. 129-18).

Despite having seen Harvey twice for his dental pain, Dr. Taylor viewed Harvey's situation as "not an emergency," but rather "a routine appointment." *See* 4/21/2021 Taylor Dep., at 119:4-5 (Dckt. No. 122-14). She reminded him that the referral period for an appointment at Stroger was between four and twelve weeks. *See* Pl.'s Dental Records, at 3 (Dckt. No. 129-18). Again, the record is silent as to why the jail dentist could not perform the extraction procedure herself. But for whatever reason, Harvey was referred to Stroger and needed to wait.

But Harvey was in pain and wanted to be seen sooner. *Id.* So, "[i]n a good effort to address his request" for treatment, Dr. Taylor contacted Laura Hernandez, the scheduling clerk, and asked for Harvey's oral surgery appointment at Stroger to be expedited. *Id.*; Pl.'s L.R. 56.1 Resp., at ¶ 63 (Dckt. No. 128).

Hernandez did just that, and moved up the date of Harvey's appointment, to January 24, 2019. *See* Scheduling Records, at 7 (Dckt. No. 122-13). She expedited the appointment by nearly two months. She moved up the appointment from March 18 to January 24. *Id.* at 9; *see also* Pl.'s L.R. 56.1 Resp., at ¶¶ 55, 63–64 (Dckt. No. 128).

When Harvey showed up for his scheduled extraction on January 24, 2019, he was diagnosed with caries on two teeth. *See* Pl.'s L.R. 56.1 Resp., at ¶¶ 65–67 (Dckt. No. 128). The resident oral surgeon caring for Harvey, Dr. Sean Moghadam, surgically removed those two teeth at that appointment. *Id.* at ¶ 68.

Dr. Moghadam found no abscess, facial swelling, purulence or puss, lesions, growth or any other abnormalities. *Id.* at ¶ 69; Moghadam Decl., at ¶ 13 (Dckt. No. 122-16). He considered Harvey's condition to be routine. *See* Moghadam Decl., at ¶ 13.

## Procedural History

The departure of the two teeth led to Harvey's arrival in the federal courthouse. *See* Cplt. (Dckt. No. 1). He filed suit with the benefit of counsel in 2019, and then filed an amended complaint in 2020. *See* Am. Cplt. (Dckt. No. 44).

In his amended complaint, Harvey brought claims against Sheriff Dart in his official capacity and against Cook County under section 1983 for inadequate medical care. *Id.* at ¶ 21. There is no individual capacity claim. The amended complaint spanned only five pages. Plaintiff filed on behalf of a putative class (*id.* at ¶ 22), but he never filed a motion for class certification.[1]

Sheriff Dart and the County moved to dismiss the complaint for failure to state a claim. *See* Mtn. to Dismiss (Dckt. No. 46). This Court, in turn, "read the complaint as comprising two separate claims: a failure to see a dentist in a timely manner, and a failure to see an oral surgeon in a timely manner." *See* Mem. Opin. & Order, at 6 (Dckt. No. 110).

As this Court explained, "[t]his case involves policies about two varieties of delegation – inside the Jail, and outside the Jail. The Jail delegated to dental assistants the task of scheduling

---

[1] Plaintiff's counsel filed a similar case about delayed dental care at Cook County Jail on behalf of another plaintiff. *See Whitney v. Khan*, 18-cv-4475 (N.D. Ill.). In that case, Judge Kennelly certified the following class: "all persons assigned to be treated by the Residential Treatment Unit dental clinic from January 1, 2017 to the date of entry of judgment, who submitted a written 'Health Service Request Form' processed as 'urgent' by the RTU dental assistant and did not receive an evaluation by a dentist for at least 14 days after submitting the request." *See* 3/11/19 Order, at 14 (Dckt. No. 65). The certification of that class might explain why Harvey did not seek a class in the case at hand.

dental appointments.  So, that's an in-house delegation.  The Jail also delegated to Stroger

Hospital the task of performing oral surgery.  That's delegation through outsourcing."  *Id.* at 8.

This Court ruled that there was nothing constitutionally problematic about the decision to

delegate certain tasks to certain people.  Harvey "cannot challenge the decision to have dental

assistants book the appointments, or the decision to use an outsider to pull teeth.  Those

decisions, in and of themselves, are not problematic within the meaning of *Monell*.  Jails always

need to decide who does what, and *Monell* does not require any specific allocation of tasks."  *Id.*

Delegation *qua* delegation is not a constitutional violation.  "A policy of delegating the

scheduling of appointments, in and of itself, cannot be the moving force behind Harvey's injury.

*Every* policy must be applied by employees.  Entities delegate everything to human beings –

*someone* has to do it.  The decision to assign a specific task to certain people can't give rise to

liability because tasks don't perform themselves."  *Id.* at 10.

But a claim could exist if "the Jail knows that the delegation means that inmates are not

receiving medical care that passes constitutional muster.  Knowledge of repeated constitutional

violations can give rise to liability."  *Id.* at 8.

That is, a municipality is not liable simply because an employee fails to follow a policy.

"But the situation changes if the municipality has knowledge that the employees in question are

repeatedly engaging in conduct that violates constitutional rights."  *Id.* at 12.  A widespread

practice of violating constitutional rights can give rise to liability under *Monell.*

In the end, the Court granted in part and denied in part the motion to dismiss.  Basically,

this Court dismissed the complaint to the extent that it alleged that delegating tasks to certain

people was an unconstitutional policy.  But the Court allowed the complaint to go forward to the

extent that it alleged that Cook County Jail had a widespread practice of denying timely dental care.

Specifically, on the claim about the scheduling of appointments, the Court allowed the complaint to "go forward to the extent that Plaintiff is alleging that Defendants knew about a widespread practice of providing constitutionally inadequate dental care by delaying appointments." *Id.* at 13. When this Court issued that ruling, it had in mind the allegation of the complaint that "Defendants Dart and Cook County are aware that *hundreds* of patients at the Jail suffer gratuitous dental pain because of the policy to delegate scheduling responsibility to the dental assistant." *See* Am. Cplt., at ¶ 16 (Dckt. No. 44) (emphasis added).

On the claim about scheduling oral surgery, the Court landed in the same place. The Court held that there is nothing unconstitutional about using an off-site facility for oral surgery. *See* Mem. Opin. & Order, at 13–15 (Dckt. No. 110). The policy itself passed constitutional muster. But the Court allowed the complaint to proceed "to the extent that Plaintiff is alleging that Defendants knew about a widespread practice of providing constitutionally inadequate dental care by using off-site oral surgeons." *Id.* at 17.

Sheriff Dart and Cook County later moved for summary judgment. *See* Defs.' Mtn. for Summ. J. (Dckt. No. 123). Defendants argue that Harvey suffered no harm while he was waiting for an appointment, and waiting for an extraction by an oral surgeon. As they see it, his condition got no worse, and he could have taken pain medication in the meantime. Defendants also contend that there is no evidence of a widespread practice of delayed dental care. Finally, Defendants argue that there is no evidence of deliberate indifference or causation.[2]

---

[2] As an aside, the Rule 56.1 statements of fact and the responses were borderline unreadable. (But the Court read them.) The parties launched objection after objection, caveat after caveat, nitpick after nitpick, and quibble after quibble. Few paragraphs with proposed facts survived unscathed. By the look of things, the parties did their level best to gum up the works and throw sand in the gears.

**Legal Standard**

A district court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive summary judgment, the opposing party must go beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256.

The Court construes all facts in the light most favorable to the nonmoving party, giving him the benefit of all reasonable inferences. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists. *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the non-movant. *See Celotex Corp.*, 477 U.S. at 322; *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

**Analysis**

Harvey brings a Fourteenth Amendment claim about the adequacy of his medical care against Cook County and Sheriff Dart in his official capacity. An official-capacity claim is the same thing as a claim against the municipality itself. *See Kentucky v. Graham*, 473 U.S. 159,

165–66 (1985). So *Monell* applies. *See generally Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978).

*Monell* provides the familiar framework for constitutional claims under section 1983 against a municipality. "Section 1983 creates a private right of action against any 'person' who violates the plaintiff's federal rights while acting under color of state law." *See Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021). In *Monell*, the Supreme Court held that a municipality is a "person" within the meaning of section 1983. *See Monell*, 436 U.S. at 691–94.

But that conclusion came with a number of important limitations. A plaintiff with a *Monell* claim must overcome a series of hurdles, and surmounting them in succession is no small feat. "*Monell* liability is rare and difficult to establish." *See Stockton v. Milwaukee County*, 44 F.4th 605, 617 (7th Cir. 2022).

Under *Monell*, a municipality is responsible for "*its own*" conduct. *See First Midwest Bank ex. rel. Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 986 (2021) (emphasis in original); *Monell*, 436 U.S. at 691–92. But a municipality is not on the hook for the misconduct of its employees. There is no vicarious liability. *See Monell*, 436 U.S. at 694–95; *see also J.K.J. v. Polk County*, 960 F.3d 367, 377 (7th Cir. 2020) (en banc) ("Time and again the Supreme Court has reinforced the strict prohibition against allowing principles of vicarious liability to establish municipal liability under § 1983.").

To prevail on a section 1983 claim against a municipality, a plaintiff "must challenge conduct that is properly attributable to the municipality itself." *See LaPorta*, 988 F.3d at 986. Three types of actions can give rise to liability: "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and

well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *See Spiegel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019).

The "critical question" is whether the municipality had a policy, practice, or policymaker that gave rise to the harm. *See Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017) (en banc) ("The critical question under *Monell* . . . is whether a municipal (or corporate) policy or custom gave rise to the harm (that is, caused it), or if instead the harm resulted from the acts of the entity's agents."). The need for a policy, practice, or policymaker is about attribution – it ensures that it is appropriate to pin the conduct on the municipality itself.

Other "guardrail[s]" protect a local government from liability, too. *See J.K.J.*, 960 F.3d at 377. A plaintiff "must show that the 'policy or custom demonstrates municipal fault,' *i.e.,* deliberate indifference." *See Dean*, 18 F.4th at 235 (quoting *LaPorta*, 988 F.3d at 986). And then, a plaintiff must prove that the municipality's action was the "moving force" behind the violation. *See Monell*, 436 U.S. at 694.

The barriers posed by *Monell* are not mere formalities. They "'must be scrupulously applied' to avoid a claim for municipal liability backsliding into an impermissible claim for vicarious liability." *Bohanon v. City of Indianapolis*, 46 F.4th 669, 676 (7th Cir. 2022) (quoting *LaPorta*, 988 F.3d at 987). The need for vigilance is important "where (as here) 'a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so.'" *Id.* (quoting *Bd. of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 405 (1997)). "In these circumstances a rigorous application of the proof requirements is especially important." *Id.*

Those *Monell* guardrails – municipal action (through a policy or practice), municipal fault, and "moving force" causation – are above and beyond the requirements of a constitutional claim in any run-of-the-mill case. As always, a plaintiff must prove an underlying constitutional deprivation. *See Bohanon*, 46 F.4th at 675; *Petty v. City of Chicago*, 754 F.3d 416, 424 (7th Cir. 2014); *Sallenger v. City of Springfield*, 630 F.3d 499, 504–05 (7th Cir. 2010). After all, if there is no underlying violation, then there is nothing to hold the municipality responsible *for*.

In sum, a plaintiff "must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *See Brown*, 520 U.S. at 404; *see also Dean*, 18 F.4th at 236 ("In short, a *Monell* plaintiff must show that some municipal action directly caused him to suffer a deprivation of a federal right, and that the municipality took the action with conscious disregard for the known or obvious risk of the deprivation."). "As we recognized in *Monell* and have repeatedly reaffirmed, Congress did not intend municipalities to be held liable unless *deliberate* action attributable to the municipality directly caused a deprivation of federal rights." *See Brown*, 520 U.S. at 415 (emphasis in original).

All in all, that's a steep climb over high hurdles. And here, Harvey does not get very far. The parties devote sizeable real estate to whether there was an underlying constitutional violation. The parties are correct that the need for a constitutional violation is a threshold issue. But there is a more straightforward way to resolve the case.

Viewed as a whole, the record could not support a finding by a reasonable jury that there was a widespread practice within the meaning of *Monell* of constitutional violations involving delayed dental care. And there is no evidence of deliberate indifference, either.

16

## I.      Delayed Dental Appointments

The first part of Harvey's claim involves the delay in getting an appointment with a dentist at Cook County Jail.  Again, this Court already ruled that the policy of delegating scheduling to dental assistants is facially constitutional.  So, the question is whether Plaintiff came forward with evidence of a widespread practice.

Based on the record as a whole, Plaintiff has not mustered sufficient evidence that Defendants have a widespread practice of delaying dental care.  The lack of a widespread practice means that there is no *Monell* claim.

The claim also fails for a second, independent reason.  Plaintiff has not offered sufficient evidence that Defendants acted with deliberate indifference.

### A.      Widespread Practice

Plaintiff's claim falls short because he has not presented sufficient evidence that Defendants engaged in a widespread practice of denying dental care.

The basic chronology is undisputed.  Harvey requested an appointment on December 3, and someone picked up his request form on December 4.  *See* Pl.'s L.R. 56.1 Resp., at ¶ 45 (Dckt. No. 128); Defs.' L.R. 56.1 Resp., at ¶ 28 (Dckt. No. 131).  Ten days later, on Friday, December 14, a dental assistant booked him an appointment for Tuesday, December 18.  *See* Defs.' L.R. 56.1 Resp., at ¶ 29.  And in the meantime, he suffered pain.

For present purposes, the Court takes it as a given that Plaintiff suffered significant pain while he waited for a dental appointment.  But it is not enough to offer evidence that something bad happened to Plaintiff (with rare exceptions, that is).  To bring a claim under *Monell*, a plaintiff must show a policy, a widespread practice of constitutional violations, or a decision by a high-ranking policymaker.  And here, Plaintiff comes up short.

Not every practice gives rise to liability under *Monell*.  The practice must be "widespread."  *See Connick v. Thompson*, 563 U.S. 51, 61 (2011).  To be "widespread," the municipal action must be "so permanent and well-settled that it constitutes a custom and practice."  *LaPorta*, 988 F.3d at 986; *see also Monell*, 436 U.S. at 692 (describing a widespread practice as one that is "persistent," "permanent," and "well settled").

"The gravamen 'is not individual misconduct . . . but a *widespread* practice that permeates a critical mass of an institutional body.'"  *Brown v. City of Chicago*, 2022 WL 4602714, at *36 (N.D. Ill. 2022) (emphasis in original) (quoting *Rossi v. Chicago*, 790 F.3d 729, 737 (7th Cir. 2015)).  The practice must be "so persistent and widespread as to practically have the force of law."  *See Connick*, 563 U.S. at 61.

A plaintiff "must introduce evidence demonstrating that the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision."  *Dixon v. County of Cook*, 819 F.3d 343, 348 (7th Cir. 2016) (citation omitted).  "It is not enough to demonstrate that policymakers could, or even should, have been aware of the unlawful activity because it occurred more than once."  *Phelan v. Cook County*, 463 F.3d 773, 790 (7th Cir. 2006).

Staffing shortages can give rise to a claim.  But once again, reaching the standard is a difficult climb.  "As applied to [an inadequate medical care] case such as this one, we look to see if a trier of fact could find systemic and gross deficiencies in staffing, facilities, equipment, or procedures in a detention center's medical care system.  And even if there are such deficiencies, a *Monell* claim can prevail only if a policy-making official knows about them and fails to correct them."  *Dixon*, 819 F.3d at 348.

"The unifying theme in these decisions is the acknowledgment that the word 'widespread' must be taken seriously." *Phelan*, 463 F.3d at 789–90. Satisfying that requirement requires more than lip service to the standard. "One broad, vague statement about an occurrence affecting other inmates in a detention facility does not support the inference of a 'widespread' custom." *See Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008).

In its motion to dismiss ruling, this Court ruled that the claim could proceed because the complaint alleged a widespread practice of delayed dental appointments. According to the complaint, "Defendants knew about a widespread practice of providing constitutionally inadequate dental care by delaying appointments." *See* Mem. Opin. & Order, at 13 (Dckt. No. 110). The problem wasn't with the scheduling policy itself, but with Defendants' "systemic, repeated deficiencies in scheduling." *Id.*; *see also id.* at 10 ("A policy of delegating the scheduling appointments, in and of itself, cannot be the moving force behind Harvey's injury."). This Court relied in part on the allegation that "hundreds" of inmates had suffered similar delays in receiving much-needed dental care. *See* Am. Cplt., at ¶ 16 (Dckt. No. 44).

That was then, this is now. At the summary judgment stage, allegations no longer suffice. Summary judgment is the time for evidence. Proof counts for everything, and allegations count for nothing. Summary judgment is show and tell time, but in the end, Plaintiff has little to offer.

Plaintiff's brief declares that "[t]his delay in treatment was also experienced by numerous other detainees at the jail." *See* Pl.'s Resp., at 7 (Dckt. No. 130); *see also id.* at 3 ("Plaintiff has identified numerous inmates who were delayed evaluation after submitting a HSRF in need of an urgent dental evaluation.").

The number isn't so numerous. In his statement of additional facts, Plaintiff came forward with only six detainees who experienced delays when seeking dental appointments. *See* Pl.'s Statement of Additional Facts, at ¶¶ 15–19, 39 (Dckt. No. 129). Six detainees is a far cry from "hundreds." *See* Am. Cplt., at ¶ 16 (Dckt. No. 44).

And even then, the span of time waters down the number. The examples come from a period spanning from April 2017 to March 2019. *See* Pl.'s Statement of Additional Facts, at ¶ 15 (March 2019); *id.* at ¶ 16 (October 2018); *id.* at ¶ 17 (April 2018); *id.* at ¶ 18 (June 2018); *id.* at ¶ 19 (June 2017); *id.* at ¶ 39 (April 2017). That's roughly two years. Basically, Plaintiff has come forward with a handful of examples – a few detainees each year, tops.

The number is especially small given the number of inmates who are incarcerated at Cook County Jail. Thousands of detainees are at Cook County Jail at any one time, with tens of thousands coming and going each year. *See* Cook County Government, Department of Corrections, https://www.cookcountyil.gov/service/department-corrections (last visited March 14, 2023) ("The Cook County Department of Corrections (CCDOC) is one of the largest single site county pre-detention facilities in the United States. Primarily holding pre-trial detainees, the Department admits approximately roughly 100,000 detainees annually and averages a daily population of 9,000."). That's a lot of teeth.

When evaluating frequency, the raw number of incidents is not the entire universe. The *denominator* matters, too. The percentage sometimes says more than the absolute number.

It's hard to imagine any problem at a large facility like Cook County Jail that *isn't* experienced by more than one inmate. Given the numbers, problems are bound to repeat themselves. If six examples are enough in a large institutional setting, *Monell* claims would be the rule rather than the exception. It's hard to see how *Monell* would do much work. Instead of

a "guardrail[]," *Monell* would be less effective than a faded yellow line on the side of the road. *See J.K.J.*, 960 F.3d at 377.

In the grand scheme of things, six examples is not much of a practice. The incidents are "so few and far between that they could not plausibly be described as 'so persistent and widespread as to practically have the force of law.'" *Bridges v. Dart*, 950 F.3d 476, 480 (7th Cir. 2020) (quoting *Connick*, 563 U.S. at 61); *see also Hildreth v. Butler*, 960 F.3d 420, 427 (7th Cir. 2020) ("Three instances of prescription delays over nineteen months involving solely one inmate fail to qualify as a widespread unconstitutional practice so well-settled that it constitutes a custom or usage with the force of law."); *Doe v. Vigo County*, 905 F.3d 1038, 1045 (7th Cir. 2018) (holding that a "handful of incidents of misconduct," including three incidents of sexual contact, two incidents of inappropriate comments, and two allegations of harassment over two decades "is not enough to establish a custom or practice"); *Chatham v. Davis*, 839 F.3d 679, 685 (7th Cir. 2016) ("*Monell* claims based on allegations of an unconstitutional municipal practice or custom – as distinct from an official policy – normally require evidence that the identified practice or custom caused multiple injuries."); *Dixon*, 819 F.3d at 348 ("A plaintiff must introduce evidence demonstrating that the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision. This requires more than a showing of one or two missteps.") (internal quotation and citation omitted); *Rossi*, 790 F.3d at 737 ("[T]he gravamen is not individual misconduct . . . (that is covered elsewhere under § 1983), but a *widespread practice* that permeates a critical mass of an institutional body.") (emphasis in original); *Wilson v. Cook County*, 742 F.3d 775, 780 (7th Cir. 2014) ("Although this court has not adopted any bright-line rules for establishing what constitutes a widespread custom or practice, it is clear that a single incident – or even three incidents – do not suffice.");

*Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) ("[T]here is no clear consensus as to how frequently such conduct must occur to impose *Monell* liability, except that it must be more than one instance, or even three.") (cleaned up); *Grieveson*, 538 F.3d at 774 (addressing "four incidents" experienced by a single inmate); *Palmer v. Marion County*, 327 F.3d 588, 596 (7th Cir. 2003) ("When a plaintiff chooses to challenge a municipality's unconstitutional policy by establishing a widespread practice, proof of isolated acts of misconduct will not suffice; a series of violations must be presented to lay the premise of deliberate indifference."). A practice is not widespread if it took place only a handful of times.[3]

Apart from the six examples over two years, there isn't much else to go on. Plaintiff has offered a smattering of quotes from depositions and documents, but they don't get him very far. The testimony is abstract, and at a high level of generality. It does not support the notion that there is a widespread practice of delaying dental appointments.

For example, Plaintiff points to a statement by the Cook County Director of Oral Health (Dr. Jorelle Alexander) in September 2013, five years before Plaintiff requested treatment. Dr. Alexander said that the process of scheduling dental appointments was "inefficient." *See* Pl.'s Statement of Additional Facts, at ¶ 10 (Dckt. No. 129); *see also* 9/10/2013 Alexander Email, at 1 (Dckt. No. 129-9).

Evidence about inefficiency – at a high level of generality – does not shed much light on whether there is a widespread practice of unconstitutional delays. A reference to inefficiency

---

[3] The Seventh Circuit has not pinned down a minimum number of incidents necessary to constitute a widespread practice. *See, e.g.*, *Hildreth v. Butler*, 960 F.3d 420, 427 (7th Cir. 2020) ("Although this court has not adopted any 'bright-line rules' defining a widespread practice or custom, we have acknowledged that the frequency of conduct necessary to impose *Monell* liability must be more than three."); *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010). In fact, it has shied away from doing so. One possible analogy is a Lite-Brite, or one of those signs with scrolling text from flashing lightbulbs (like ticker sign, or a marquee sign outside a theater). There must be enough data points to show a discernible picture. A small sample set with a smattering of data points doesn't reveal very much.

doesn't reveal anything about how often delays happened, or how long they lasted. And in fact, inefficiency does not necessarily mean that delays happened at all. A process can be inefficient but on time. Imagine getting a dental exam and having one dentist per tooth.[4]

In a similar vein, Plaintiff points to testimony from Dr. Alexander about care provided in 2017–2019. Dr. Alexander "was unable to recall" if patients received prompt dental appointments when they turned in health service request forms for bad toothaches. *See* Pl.'s Statement of Additional Facts, at ¶ 27 (Dckt. No. 129). That's not evidence. That's the absence of evidence.

Plaintiff also relies on the testimony of Dr. Fauzia Khan, a dentist at the jail. According to Plaintiff, Dr. Khan "testified that during this period, patients experienced delays of up to thee [sic] to four weeks to initially see the jail dentist after submitting an HSRF." *Id.* at ¶ 26; *see also* Khan Dep., at 97:3-13 (Dckt. No. 129-13). For example, Dr. Khan testified that sometimes – she didn't say how often – there was a "considerable delay" in seeing an inmate with dental pain:

> Q:  Did the same situation happen to your knowledge in regards to
>     patients initially filling out Health Service Request Forms and
>     there being a delay – a considerable delay for them to be evaluated
>     by you in the RTU dental clinic for dental pain?
>
> [objections omitted]
>
> A:  Yes.

---

[4] Taking a step back, a widespread practice of inefficiency, without more, would not cut it because inefficiency is not a constitutional violation. Again, there is no *Monell* claim without an underlying constitutional violation. *See Dean*, 18 F.th at 234 ("[I]t is usually necessary in *Monell* cases to introduce evidence of a prior pattern of similar *constitutional violations*.") (emphasis added). Inefficiency and unconstitutionality are not the same thing. Not even close. A practice can be inefficient but constitutional, or efficient but unconstitutional, or both, or neither. It's a long throw between inefficiency and unconstitutionality. One doesn't say much about the other. What's more, evidence about inefficiency does not move the ball when it comes to deliberate indifference, either, unless the municipality is aware that inefficient care leads to deficient care.

*See* Pl.'s Statement of Additional Facts, at ¶ 24 (Dckt. No. 129); *see also* Khan Dep., at 198:23 – 199:8 (Dckt. No. 129-13).

That testimony adds something to the mix. Even so, it doesn't shed much light on whether that practice was widespread. And it leaves important questions unanswered. How many patients? What care did they request in the HSRFs? How urgent were the requests?

Along those lines, Plaintiff puts undue weight on an email from Dr. Khan to Dr. Alexander about communication problems and related issues with scheduling and staffing. Dr. Khan wrote: "Patients are not returning in a timely manner, period." *See* 8/26/2019 Khan Email, at 1 (Dckt. No. 129-14).

That cryptic line is at a high level of generality. It does not reveal anything about the frequency or extent of any delays. It also does not address whether the untimely visits resulted in constitutionally inadequate medical care. And that's what Plaintiff needed to support a claim about a widespread practice.

Even then, read in context, the email appears to refer to patients returning to the jail dentist for a follow-up visit for an extraction. *Id.* ("Whenever I bring up the fact that the patient was not scheduled for an extraction, you automatically turn around and are quick to blame me, which is completely unwarranted."); *id.* ("I clearly dictate that the patient must return for the extraction."). But here, Plaintiff is complaining about getting an initial appointment with a jail dentist (after submitting the HSRF), not getting a second appointment with the jail dentist.

Plaintiff then puts forward testimony about staffing shortages, including the difficulties finding an adequate number of dental assistants. *See* Pl.'s Statement of Additional Facts, at ¶¶ 1–2 (Dckt. No. 129). For example, Dr. Claudia Fegan, the Chief Medical Officer for the

24

County health system, heard about the difficulties of hiring dental assistants from Dr. Alexander

(again, the Director of Oral Health).  Dr. Fegan testified:

> Q: Has Dr. Alexander ever expressed any difficulty with the staffing of dental assistants at Cermak?
>
> A: Yes.
>
> Q: What has Dr. Alexander said to you about dental assistants and challenges?
>
> A: There are problems with having an adequate number of staff.  And there have been times when staff have been reluctant to work in certain areas.

*See* Fegan Dep., at 39:8 – 40:3 (Dckt. No. 128-2).

As another example, the record includes an email exchange between Dr. Alexander (the

Director of Oral Health) and Dr. Taylor (a jail dentist) about the lack of dental assistants.  Dr.

Alexander informed Dr. Taylor that she "d[id] not have a DA (dental assistant) because there is

not one to send to you.  This happens for ALL of the doctors at all of the locations when there is

not a DA. . . . This is nothing new and has happened as long as you have been at

CERMAK/CCHHS."  *See* 2/8/2018 Taylor Email (Dckt. No. 129-2).  In response, Dr. Taylor

described the Division 10 dental clinic as "inconsistent" and "under-staffed."  *Id.*  She further

informed the Director that she was "no longer going to beat a dead horse.  Staffing or lack there

of [sic], is your problem not mine. . . .  If I have an Assistant I do, if I don't, I don't. . . .  I will

not continue to ask you for the tools to do my job, which by law is required.  I have tried my best

to go over and beyond knowing full well this should not be happening."  *Id.*

That evidence does not move the needle very far.  A staffing shortage, without more, is

not a constitutional violation.  (It is all too common in the private sector, too.)  To give rise to a

claim, the evidence would need to show "systemic and gross deficiencies in staffing." *Dixon*, 819 F.3d at 348.

Evidence about a staffing shortage can support a claim, but on this record, the evidence does not carry the claim very far. The evidence hovers at a high level of generality, without getting down to brass tacks and showing a "systemic and gross" deficiency. *Id.* How short was the shortage?

The staffing shortage would need to be tied to deficiencies in care, too. A lack of dental assistants does not reveal *whether* there were delays, or *how often* there were delays. It does not reveal whether there was a widespread practice of inflicting unnecessary pain through delayed dental appointments.

Finally, Plaintiff relies on the testimony of his expert, Dr. Lockhart. According to Plaintiff, Dr. Lockhart opined that there was a "common pattern of delays for patients to be evaluated by the dentist after submitting a HSRF that should be processed as urgent." *See* Pl.'s Statement of Additional Facts, at ¶ 36 (Dckt. No. 129) (citing Lockhart Report, at 6–12 (Dckt. No. 128-22)).

But in the pages in question, Dr. Lockhart merely summarized the facts about Plaintiff's experience, and then slapped on the labels "systemic deficiencies" and "systemic delays." *See* Lockhart Report, at 4, 6 (Dckt. No. 128-22). The report included no expert analysis of whether there is a widespread practice of inflicting unnecessary pain by delaying dental appointments. A conclusory statement that it was "common" to wait weeks doesn't count. *Id.* at 12. That statement was supported by nothing, so it counts for nothing.

Dr. Lockhart also mused that Plaintiff's "delay to be treated was caused by poor oversight of the dental clinics and likely due to inadequate staffing." *See* Lockhart Report, at 4

(Dckt. No. 128-22). That's not admissible expert testimony. Experts don't offer much value when they merely regurgitate the evidence and then offer a raw conclusion. She is over her skis, too. Dr. Lockhart may have dental expertise, but she does not have expertise figuring out why Plaintiff waited 10 days for an appointment.

The record lacks evidence of a widespread practice, but that evidentiary gap does not necessarily doom the claim. In rare occasions, even a single incident could give rise to *Monell* liability if the risk is "so obvious that it compels municipal action." *See J.K.J.*, 960 F.3d at 381; *see also Bohanon*, 46 F.4th at 677 (collecting cases). But that's not this case, by a long shot. Plaintiff had to wait two weeks to see a dentist for a toothache. It was far from obvious that a two-week delay could give rise to a constitutional injury.

This Court acknowledges that another judge in this District has reached a different conclusion on a very similar issue, based on a substantially similar body of evidence. *See Whitney v. Khan*, 2021 WL 105803 (N.D. Ill. 2021) (addressing the policy of referring detainees to Stroger Hospital for dental extractions). This Court fully respects that thoughtful decision, but simply sees things a little differently and lands in a different place.

It is no answer to say that this Court should simply send this case to the jury, and let the jury figure it out. To get there, Plaintiff has to pass through the checkpoint of summary judgment. To get past the gate, Plaintiff has the burden of showing that he has enough evidence to support a finding in his favor by a reasonable jury.

The Supreme Court requires lower courts to uphold the "rigorous requirements" of *Monell*, so that municipal liability does not "collapse[] into *respondeat superior* liability." *See Brown*, 520 U.S. at 405; *see also LaPorta*, 988 F.3d at 987 ("These requirements . . . must be scrupulously applied in every case alleging municipal liability."). Lower courts must ensure that

litigants stay within the guardrails of *Monell*. And if they don't, they have reached the end of the road.

In the end, Plaintiff has not come forward with enough evidence to support a finding by a reasonable jury that Defendants engaged in the widespread practice of providing constitutionally deficient dental care.

### B.     Deliberate Indifference

Plaintiff's claim cannot survive summary judgment for a second reason, above and beyond the lack of evidence of a widespread practice. Plaintiff has not offered evidence that Defendants acted with deliberate indifference.

Under *Monell*, a plaintiff must show that a defendant acted with the "'requisite degree of culpability.'" *See J.K.J.*, 960 F.3d at 377 (quoting *Brown*, 520 U.S. at 404). More specifically, a plaintiff must offer evidence of deliberate indifference. *See LaPorta*, 988 F.3d at 987.

"This is a high bar." *Id.* "A plaintiff must prove that it was obvious that the municipality's action would lead to constitutional violations and that the municipality consciously disregarded those consequences." *Id.*; *see also Dean*, 18 F.4th at 236 ("In short, a *Monell* plaintiff must show . . . that the municipality took the action with conscious disregard for the known or obvious risk of the deprivation."); *Brown*, 520 U.S. at 410 ("'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."); *see also Bohanon*, 46 F.4th at 675 ("This is not an easy showing."). Deliberate indifference "is a high bar 'because it requires a showing [of] something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'" *Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022) (quoting *Rosario v. Brown*, 670 F.3d 816, 821 (7th Cir. 2012)).

Deliberate indifference goes beyond a failure to act – a municipality's conduct must rise to the level of criminal recklessness. *See Flores v. City of South Bend*, 997 F.3d 725, 729 (7th Cir. 2021). "Negligence or even gross negligence on the part of the municipality is not enough." *LaPorta*, 988 F.3d at 987.

In particular, proving deliberate indifference based on a widespread practice is a high hurdle. "To establish deliberate indifference to the purportedly unconstitutional effects of a widespread practice, [a plaintiff] must point to other inmates injured by that practice." *Stockton*, 44 F.4th at 617; *see also City of Oklahoma City v. Tuttle*, 471 U.S. 808, 824 (1985) ("[W]here the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary.").

"When a plaintiff chooses to challenge a municipality's unconstitutional policy by establishing a widespread practice, proof of isolated acts of misconduct will not suffice; a series of violations must be presented to lay the premise of deliberate indifference." *Palmer*, 327 F.3d at 596; *see also Ruiz-Cortez v. City of Chicago*, 931 F.3d 592, 599 (7th Cir. 2019); *Chatham*, 839 F.3d at 685 ("*Monell* claims based on allegations of an unconstitutional municipal practice or custom . . . normally require evidence that the identified practice or custom caused multiple injuries.").

Plaintiff must show multiple injuries from which a jury could reasonably find that "'the plainly obvious consequences' of the practice 'would result in the deprivation of a federally protected right.'" *Stockton*, 44 F.4th at 617 (quoting *Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002)); *see also Brown*, 520 U.S. at 411; *Calderone v. City of Chicago*, 979 F.3d 1156, 1164–65 (7th Cir. 2020) ("But where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both

the requisite fault on the part of the municipality, and the causal connection between the policy and the constitutional deprivation. One single incident cannot suffice; rather, [plaintiff] must show a series of constitutional violations.") (internal citation and quotation marks omitted).[5]

Based on the record at hand, Plaintiff has fallen far short of overcoming this high hurdle. There was no pattern of delays, let alone a pattern of constitutional violations.

As the Court has discussed, Harvey unearthed only six other instances in a two-year period in which detainees received delayed dental care. Counting him, that's seven detainees. Seven delays could not have put Defendants "on notice of the unconstitutional consequences of [their] policy, such that its continued adherence to the policy might establish the conscious disregard for the consequences of [their] action – the deliberate indifference – necessary to trigger municipal liability." *See Dean*, 18 F.4th at 236 (cleaned up); *see also Stockton*, 44 F.4th at 617.

Again, testimony about staffing shortages and inefficiencies in general does not cut it. To prove a *Monell* claim, a plaintiff must demonstrate deliberate indifference. That requirement means that the defendants must be aware of the link between the staffing shortages and the alleged constitutional deprivations. *See Stockton*, 44 F.4th at 618 ("True, the Shansky reports portray the MCJ as persistently struggling to maintain adequate medical staffing levels and appropriately respond to inmate sick call slips. Yet the Shansky reports do not connect this purported municipal practice to any inmate injury."). But here, Plaintiff has not shown that it

---

[5] The number of other violations speaks to two elements of a *Monell* claim about a custom or practice. The municipal action must occur repeatedly, or else it is not a "widespread practice." Also, the action must affect a number of inmates to make the violation sufficiently obvious to give rise to a finding of deliberate indifference. The number of violations can do double duty.

was "plainly obvious" that a staffing shortage was causing detainees to suffer constitutional injuries through delayed dental care. *Id.* at 617.[6]

The record does not include any evidence that Defendants deliberately delayed or withheld dental care from Plaintiff, either. If anything, the record confirms that no one knows why it took 10 days for him to get booked for an appointment. *See* Defs.' L.R. 56.1 Resp., at ¶ 29 (Dckt. No. 131). On this record, the delay that Harvey experienced more closely resembles the "[i]solated acts of individual employees" than it does one of a series of constitutional violations that could reasonably lay the groundwork for deliberate indifference. *See Reck v. Wexford Health Sources, Inc.*, 27 F.4th 473, 488 (7th Cir. 2022).

\* \* \*

In sum, Plaintiff has not presented sufficient evidence of a widespread practice, or evidence of deliberate indifference. So he can't get to trial.

## II. Delay in Seeing an Oral Surgeon

Harvey's second claim is about the delay that Harvey experienced in having his teeth extracted. *See* Mem. Opin. & Order, at 13–14 (Dckt. No. 110). The delay, according to Harvey, stemmed from the jail's lack of an on-site oral surgeon. The delay resulted from the practice of referring patients to Stroger Hospital to receive tooth extractions. *Id.* at 13.

---

[6] In some cases involving delayed medical care, the issue of "moving force" causation is an issue, too. For example, imagine a situation in which a detainee suffered a stroke, but no one gave him care. And two days later, he died. In that case, a question arises whether the delay in care caused the injury. Maybe the delay made no difference. *See, e.g.*, *Stockton*, 44 F.4th at 618 ("We are not convinced a jury could reasonably conclude a timely response by MCJ medical staff to Madden's allergy complaint would have led to the correct diagnosis or treatment for infective endocarditis."). But causation might be less of an issue when the injury is pain – and the longer it lasts, the greater the injury. In that situation, the delay in giving care arguably causes the injury (*i.e.*, more pain). The delay extends the period of suffering pain, and the prolonged pain *is* the injury.

To review the bidding, it took about five weeks (37 days) to get the tooth extraction at Stroger Hospital after the jail dentist made the referral. Specifically, on December 18, 2018, the jail dentist referred Plaintiff for a tooth extraction at Stroger Hospital. *See* Pl.'s L.R. 56.1 Resp., at ¶ 55 (Dckt. No. 128). That appointment at Stroger Hospital was originally booked for March 18, 2019. *Id.* But after Plaintiff went to the jail dentist again on January 14, 2019, he received an accelerated appointment at the hospital. *Id.* at ¶ 56. The appointment at Stroger Hospital took place on January 24, 2019, and that's when the extraction took place. *Id.* at ¶¶ 64–68.[7]

In his brief, Plaintiff argues that the jail should not have referred him to Stroger Hospital for the extraction at all. In his view, a jail dentist should have pulled his teeth. "In this case plaintiff required simple extractions to test a painful infection and if Dr. Taylor felt uncomfortable, she should have referred him to another dentist at the jail, not an oral surgeon." *See* Pl.'s Resp., at 12 (Dckt. No. 130). At the same time, Plaintiff points fingers at the jail for not having the necessary medical equipment to pull teeth. *Id.* at 13 ("A trier of fact may reasonably infer, based on Dr. Taylor's testimony that there were systemic deficiencies with equipment to perform a simply routine extraction of plaintiff's teeth to treat plaintiff's pain and infection.").

That ship has sailed. Plaintiff is attempting to challenge the policy of sending inmates off-site for medical care. But this Court already ruled that the policy of using an off-site medical facility is facially constitutional. *See* Mem. Opin. & Order, at 14 (Dckt. No. 110). The Constitution may require jails to provide medical care, but it says nothing about where that care must take place. *See Kudla v. City of Hammond*, 2022 WL 2171229, at *9 (N.D. Ind. 2022)

---

[7] As an aside, this Court has doubts about whether waiting 37 days to get a tooth extraction by an oral surgeon is so long that it rises to the level of a constitutional deprivation. To bring a claim, a plaintiff needs to show that the care was objectively unreasonable. *See Williams v. Ortiz*, 937 F.3d 936, 942–43 (7th Cir. 2019). Even so, this Court does not need to reach that question.

("[T]his court is not aware[] of any authority finding that a short-term holding facility such as the Jail is constitutionally required to have on-site medical staff.").

Again, "a plaintiff seeking to hold a municipality liable for a facially lawful policy generally must prove a prior pattern of similar constitutional violations resulting from the policy." *Dean*, 18 F.4th at 236. "[W]here the policy relied upon is not itself unconstitutional, *considerably more proof than the single incident will be necessary in every case* to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." *Id.* (emphasis in original) (quoting *Tuttle*, 471 U.S. at 824).

The question, then, becomes whether Plaintiff has mustered enough evidence of a widespread practice of delayed dental care at Stroger Hospital. And once again, the claim falls short, for the same reasons already addressed. Plaintiff relies on the experiences of even fewer detainees (five, not six), all of whom experienced delayed tooth extractions at Stroger Hospital. *See* Pl.'s Statement of Additional Facts, at ¶¶ 15–19 (Dckt. No. 129); *but see id.* at ¶ 39 (describing the experience of the sixth detainee, who did not need an extraction in the end).

The evidence is the same, and the outcome is the same, too. Plaintiff has offered a handful of examples of other detainees who received delayed tooth extractions. If anything, the evidence is even weaker on the claim about Stroger Hospital, because there is no evidence whatsoever of any staff shortages at the hospital.

Even when viewed in a light favorable to Plaintiff as the non-movant, the record cannot support a finding that Defendants had a widespread practice of denying timely dental care to inmates by referring them to Stroger Hospital. The record is devoid of evidence of deliberate indifference, too.

### Conclusion

For the reasons stated above, Defendants' motion for summary judgment is granted.

Date:  March 17, 2023    _____

Steven C. Seeger
United States District Judge